GOVERNMENT OF THE VIRGIN ISLANDS, Plaintiff

v.

CLAYTUS DE LEON, TOMAS HUMBERTO COLON–FRANCO,
Defendants

Criminal No. 76-30

District Court of the Virgin Islands

Div. of St. Croix

March 30, 1976

13

YOUNG, *District Judge*

## MEMORANDUM OPINION AND ORDER

Before the Court are the motions of the two defendants, Claytus De Leon and Tomas Humberto Colon-Franco ("Colon"), to suppress certain tangible evidence seized from the person of each and from the car in which one was seated, and to suppress the statements given to the United States Immigration Service officials by De Leon and Colon following their respective arrests. On the morning of trial, following a day long suppression hearing in this matter, I stated my rulings on these motions with supportive reasons into the record, reserving the right to reduce them to written memorandum form at a later time. I now take this opportunity to discuss the very important constitutional issues which are raised by these motions.

# I. Background Facts

An Amended Information charged defendants Colon and De Leon with conspiracy to arrange a fraudulent marriage between an alien and Colon, a United States citizen, for the purpose of assisting the alien to fraudulently obtain an immigrant visa. The basic scheme, as developed from the evidence adduced at the suppression hearing, appears as follows.

During the month of January, 1976, defendant De Leon was introduced to co-conspirator Lorna Claudette Davis, an alien, by co-conspirator Thaldius J. Spencer. De Leon offered to arrange a fraudulent marriage of Davis so that she could fraudulently obtain an immigrant visa. Defendants De Leon and Colon agreed with co-conspirators Davis and Spencer to arrange such a marriage between Davis and Colon in return for approximately $550.00. After marrying Davis, Colon would file the necessary papers with the Immigration Service to enable her to obtain an immigrant visa.

On January 17, 1976, De Leon, Colon, and Davis, pursuant to their agreement, traveled to Puerto Rico to effectuate the marriage. Davis and Colon were married at Caguas, Puerto Rico, on January 19, 1976. The expenses incurred in traveling to Puerto Rico were paid by Davis and Spencer.

On February 3, 1976, Davis paid Colon the sum of $50.00 to enable him to travel to Puerto Rico to procure their marriage certificate, which he did on that day. De Leon and Colon visited Davis and Spencer on the night of February 4, 1976, advising them that Colon had obtained the marriage certificate and that he would file the papers with Immigration upon receipt of the balance of the money. De Leon and Colon agreed to return to Spencer's home on the night of February 6, 1976, to collect a partial payment.

16

On February 5, 1976, Davis was apprehended at the Spencer residence by Immigration officials as an over-stay alien illegally in the United States. At that time, Davis stated that she was married to Colon, a United States citizen. After being advised of her rights, Davis retracted her initial statement and executed an accurate, sworn statement regarding her immigration status and the marriage to Colon. Davis and Spencer agreed to keep their meeting with De Leon and Colon the following night and to pay them with money from which the serial numbers had been recorded while Immigration officers monitored the transaction.

Immigration Investigator Perry L. Suitt was in the Spencer home on the evening of February 6, 1976, when at approximately 8:15 p.m. Spencer indicated to him that Colon had arrived in an automobile driven by another individual. Suitt hid in a closet in Spencer's bedroom upon Colon's arrival. During the subsequent meeting, as recounted by Suitt, he overheard Spencer repeatedly refer to the individual as "Colon". He heard Spencer counting out $100.00 to that individual. He also heard a conversation between Spencer, Davis and the other person concerning who would keep the marriage certificate. The other person, who I find was Colon, stated that he wanted $200.00 before turning the marriage certificate over to Davis, and filing the necessary papers with Immigration.

As Colon was leaving Spencer's house, Suitt notified by his walkie-talkie Immigration officers waiting outside the residence to apprehend him. Officers made a warrantless arrest of Colon and Demetrio Felix-Ortiz, the driver of the vehicle in which the two were seated at the time of the arrest. One officer testified to seeing Colon bringing his hand out from under the seat of the car just as the officer approached the car.

17

Having been placed under arrest, Colon was ordered to leave the car. He was advised of his rights and then a full search of his person was made, again, without a warrant. The marriage certificate was recovered from one of his pockets. Next the officers searched the automobile and found $100.00 in bills under the front seat, corresponding to the serial numbers which had been recorded.

About 8:50 p.m. the same evening, following Colon's apprehension, De Leon telephoned Spencer and stated that he would come to Spencer's home that evening to get his money. De Leon arrived at 9:30 p.m. and Investigator Suitt again hid in the bedroom closet. Suitt heard Spencer repeatedly refer to the individual as Claytus (De Leon's first name), and overheard a conversation between Spencer, Davis and the individual who had arrived regarding the procedure for filing the necessary papers with Immigration.

As the individual departed from Spencer's house, Suitt again radioed the other officers to make the arrest. De Leon was arrested by the officers in Spencer's driveway, and a warrantless search of his person following the arrest uncovered sixty dollars of the recorded money in De Leon's right front pants pocket.

Later that evening Colon and De Leon both executed sworn statements to the Immigration officers. The details relating to the taking of those statements shall be reserved for that portion of the opinion. The defendants have now moved to suppress the money seized from De Leon's person, the marriage certificate seized from Colon's person, the money seized from the automobile in which Colon was riding, and the written statements given by each man to the Immigration officers at police headquarters.

## II. The Arrests

The initial issue to be decided is whether the warrantless

arrests of De Leon and Colon in the driveway of Spencer's home were lawful. The Fourth Amendment protects "the right of the people to be secure in their persons . . . against unreasonable searches and seizures . . . and no Warrants shall issue, but upon probable cause . . . ." The right of the people to be "secure in their persons" is understood to prevent unreasonable arrests or detentions and prohibit the issuance of arrest warrants without probable cause. See Henry v. United States, 361 U.S. 98 (1959).

██ The amendment protects only against "unreasonable" searches and seizures, however, so at common law there developed several instances in which it has been held to be reasonable for law enforcement agents to effect an arrest without a warrant. The rule as stated by the Supreme Court in Carroll v. United States, 267 U.S. 132 (1925) was:

> The usual rule is that a police officer may arrest without warrant one believed by the officer upon reasonable cause to have been guilty of a felony, and that he may only arrest without a warrant one guilty of a misdemeanor if committed in his presence.

This rule has been codified in some form in most jurisdictions. See, e.g., 18 U.S.C. § 3052; 5 V.I.C. § 3562.

The argument of the defendants with respect to the legality of their arrests runs as follows. They contend, paradoxical though it may seem, that the Immigration officers had, upon receipt of the signed statements of Davis and Spencer on February 5, 1976, probable cause to arrest the defendants for the crime with which they were subsequently charged more than twenty-four hours in advance of the actual arrests. Thus, they assert, it was unlawful for the officers to make these arrests without first having obtained a warrant. The argument continues that since the warrantless arrests were unlawful, evidence seized during a search made incident to the arrest is

inadmissible, as are any statements taken subsequent to the arrest since they are fruits of an illegal arrest.

■■ Initially I must determine whether the Immigration officers had probable cause to arrest De Leon and Colon prior to going to Spencer's home on February 6, 1976. The traditional definition of probable cause to make an arrest derives from Beck v. Ohio, 379 U.S. 89 (1964), where Justice Stewart wrote in describing the standard—"whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." 379 U.S. at 91. Probable cause is clearly more than mere suspicion. Mallory v. United States, 354 U.S. 449 (1957). It is not meant, however, that the arresting officer must have evidence which would satisfy the trier of fact beyond a reasonable doubt. Dumbra v. United States, 268 U.S. 435 (1925).

The evidence available to the Immigration officers prior to their arrival at the Spencer house on the night of February 6, 1976 consisted solely of the sworn statements of the two co-conspirators, Davis and Spencer. These statements, alone, may have constituted probable cause to arrest De Leon and Colon for conspiracy to violate the immigration laws.

Information supplied by a co-conspirator or an accomplice to a crime, or any person involved in the criminal activity, has frequently been recognized as sufficient to establish probable cause. See United States v. Harris, 403 U.S. 573 (1971); United States ex rel. Coffey v. Fay, 344 F.2d 625 (2d Cir. 1965); Jackson v. United States, 338 F.Supp. 7 (D.N.J. 1971); Commonwealth v. Matthews, 285 A.2d 510 (Pa. 1971); Commonwealth v. Rush, 326 A.2d 340 (Pa. 1974). In United States v. Harris, supra, the Supreme Court upheld a warrant to search for illicit

liquor, based substantially upon an informant's tip, as having been issued upon probable cause. A four-justice plurality concluded that the informant's declarations against his own penal interest, that he had purchased illicit whiskey from the person, carried their own indicia of credibility— sufficient at least to support a finding of probable cause to search. 403 U.S. at 583.

I do not believe that the cases which have reached the opposite result [See, e.g., Wong Sun v. United States, 371 U.S. 471 (1963)] have followed a different rule. They, rather, have rejected the warrants as having been founded upon probable cause because of the non-existence of sufficient indicia to establish the credibility of the informant or the reliability of the manner in which he obtained the information.

■ On February 5, 1976, the Immigration officers had in their possession sworn statements from Davis and Spencer revealing in detail the alleged conspiracy. These statements were clearly against their own penal interests. On this basis I conclude that even prior to their visit to Spencer's home on the night of February 6, 1976, the Immigration officers had probable cause to arrest De Leon and Colon for their involvement in the alleged conspiracy.

■ I cannot, however, make the next step in the defendants' argument. Merely because the officers may have had probable cause upon which to obtain a warrant to arrest De Leon and Colon prior to their surveillance at the Spencer home, I do not believe that they are *required* to effect an arrest without further investigation. Such a rule, if adopted, would thwart the legitimate needs of law enforcement. Surely if the evidence in the possession of the officers prior to the evening of February 6th had constituted far less than probable cause, they could have undertaken the planned surveillance, and if then in possession of evidence establishing probable cause, made the arrests.

There is no justification for a rule which requires police officers to halt their investigation once they obtain the bare minimum of evidence beyond probable cause. In a case such as this one, the officers may not be able to gather further evidence once the arrest is made. Requiring officers to make the arrest once probable cause is established may prevent them from obtaining enough evidence to prove a case beyond a reasonable doubt.

This "right to be arrested" argument has rarely found favor with the courts. In Hoffa v. United States, 385 U.S. 293 (1966), the defendant argued that had the Government arrested him once it had probable cause instead of continuing its investigation, it could not have continued to question him without observance of his Sixth Amendment right to counsel. Justice Stewart, writing for the Court, made short shrift of this argument. He wrote:

> Nothing in . . . any other case that has come to our attention, even remotely suggests this novel and paradoxical constitutional doctrine, and we decline to adopt it now. There is no constitutional right to be arrested. The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long. Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction. [Footnotes omitted] 385 U.S. at 310.

See also United States v. Joines, 258 F.2d 471 (3d Cir. 1958).

■ I decline to follow a rule that would have required these officers to obtain a warrant and make an arrest as soon as they might have had probable cause. Having said this, I must now decide whether the arrests of De Leon and Colon in the driveway of Spencer's home, without war-

rants, based upon the information then in the officers' possession, were lawful.

Based upon the evidence in the officers' possession[1] after overhearing the two meetings in the Spencer home on the night of February 6, 1976, I find at least two bases upon which the subsequent arrests of De Leon and Colon should be sustained as lawful. The arrest fits well within the traditional grounds on which an officer is authorized to make a warrantless arrest, as codified in 5 V.I.C. § 3562. Moreover, the conditions which obtained following the respective departures of Colon and De Leon from the Spencer home call into play the "exigent circumstances" doctrine which has evolved in the case law.

■ I find no difficulty in upholding the validity of these arrests solely upon the statutory authority for warrantless arrests contained in 5 V.I.C. § 3562. Section 3562 empowers a police officer to make a warrantless arrest when, inter alia,

". . .

(2) when a person has committed a felony although not in his presence;

(3) when a felony has in fact been committed and he has reasonable cause for believing the person to have committed it;

. . .

(5) at night, when there is reasonable cause to believe that he has committed a felony."

The cases interpreting this section make clear that probable cause for a warrantless arrest exists when the facts

---

[1] It is of no consequence that the arresting officers may have had to rely on information within the personal knowledge of Investigator Suitt to establish a basis for the arrest. The propriety of officers relying upon information received through official channels is well settled. Whitely v. Warden, 401 U.S. 560 (1971) is in no way to the contrary. There, officers arrested a suspect relying on a radio bulletin from a sheriff in another jurisdiction who had obtained a warrant for the arrest. The Court found the arrest to be unlawful solely because there was not probable cause for the warrant to issue. Had the warrant been based upon good probable cause, it would have been entirely proper for the arresting officers to rely on the radio bulletin as authority for the arrest.

23

and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the defendants had committed or were committing an offense. Government of the Virgin Islands v. Rijos, 6 V.I. 475, 285 F.Supp. 126 (D.C.I. 1968); Government of the Virgin Islands v. Rodriguez, 7 V.I. 360, 300 F.Supp. 860 (D.C.I. 1969). It is clear beyond peradventure that after Investigator Suitt overheard the two meetings in the Spencer home, the officers had, at least, probable cause to believe that a felony was being committed and that the individuals who departed from the house were committing it. Accordingly, it was lawful for the officers to effect an immediate arrest of these individuals without first obtaining a warrant.

◼ As a second basis upon which to sustain the lawfulness of these arrests, I believe that the "exigent circumstances" doctrine should be and has been expanded to include situations where there will be no hope of recovering important evidence unless a warrantless arrest, based upon probable cause, is immediately effected. The doctrine, as originally developed, was applied to situations in which police officers were in "hot pursuit" of a suspected felon. See Warden v. Hayden, 387 U.S. 294 (1967). The exigencies of the situation justified an immediate warrantless search and precluded any realistic possibility of first obtaining a warrant.

The doctrine has frequently been applied in situations where the destruction of evidence is threatened unless an immediate warrantless search and seizure is made. In United States v. Martin, 474 F.2d 262 (3d Cir. 1973), circumstances from which officers could reasonably conclude that contraband would be destroyed unless immediately seized were said to provide the exigent circumstances necessary to justify a warrantless search. In

24

United States v. Blake, 484 F.2d 50 (8th Cir. 1973), the court of appeals held that evidence which is threatened with imminent removal or destruction provides an exceptional circumstance justifying a warrantless search. See also United States v. Holiday, 457 F.2d 912 (3d Cir. 1972). In Chappell v. United States, 342 F.2d 935 (D.C. Cir. 1965), Circuit Judge Burger (now the Chief Justice) applied an "exigent circumstances" analysis to uphold a warrantless arrest as well as the search.

██ I recognize that the "exigent circumstances" doctrine has generally been applied to justify a warrantless search, not the arrest. I further realize that an arrest cannot be made as a mere pretext for making a search incident thereto. I believe, however, that the "exigent circumstances" analysis is useful for explaining why it was necessary for the officers to make a warrantless arrest based upon probable cause as Colon and De Leon departed from the Spencer home, rather than waiting to obtain a warrant. Had they waited until the next day to obtain arrest and search warrants, it is unlikely that they would have recovered the money for which the serial numbers had been marked and which had been used in the transactions.

I, thus, conclude that the warrantless arrests of De Leon and Colon were lawful. The foregoing analysis has proceeded upon my finding that the officers likely had probable cause to arrest even prior to the surveillance at Spencer's home. Even if they had less than probable cause prior to the night of February 6, 1976, the subsequent analysis follows in the same fashion. They surely passed the probable cause standard while at the Spencer residence, so then the arrests would be lawful under the same analysis.

## III. The Searches

 Having concluded that the arrests of Colon and De Leon were lawful, the question of the legality of the subsequent searches is made far less difficult. The most frequently employed exception to the Fourth Amendment warrant requirement is that a reasonable, warrantless search may be conducted pursuant to a lawful arrest. See Agnello v. United States, 269 U.S. 20 (1925). The permissible scope of a search incident to a lawful arrest was severely limited by Chimel v. California, 395 U.S. 752 (1969). In Chimel the Supreme Court held that the arresting officers may search the arrestee's person and the area within his immediate control. This limitation was thought to be strictly tied to the justifications for allowing incident searches—to enable the officer to discover and remove weapons and to seize evidence to prevent its concealment or destruction. Thus, the area in which a search was permitted was thought to be the area from which an arrestee might gain possession of a weapon or destructible evidence.

The Chimel rule has been given an expansive interpretation by the Supreme Court in two more recent decisions, United States v. Robinson, 414 U.S. 218 (1973) and Gustafson v. Florida, 414 U.S. 260 (1973). No longer is it required that the court inquire into the circumstances of each case to determine whether or not there was present one of the reasons supporting the authority for incident searches. The Court held that a custodial arrest of a suspect based upon probable cause is a reasonable intrusion under the Fourth Amendment, so a search incident to the arrest requires no additional justification. 414 U.S. at 235. Thus, a search within the Chimel scope is valid if incident to any lawful arrest.

 On this basis, there can be no doubt that the full searches of the persons of Colon and De Leon immediately

following their arrests were lawful, and any evidence seized thereby is admissible. I must deny, therefore, Colon's motion to suppress the marriage certificate which was found on his person, and De Leon's motion to suppress the sixty dollars which was found in his right front pants pocket. Colon's motion to suppress the one-hundred dollars which was found under the front seat of the car in which he was seated requires greater consideration.

Briefly, I shall recount the evidence regarding the search of the car as was developed at the suppression hearing. As Colon left the Spencer home Investigator Suitt notified the officers waiting outside the house to make the arrest. Colon entered an automobile which was parked in the driveway. The automobile belonged to Demetrio Felix-Ortiz who was seated in the driver's seat. As Investigator Escudero approached the car he saw Colon with his hand reaching down under the seat and subsequently saw his hand coming up from the floor. The two men in the car were placed under arrest and requested to leave the car. After Colon got out of the car, a spot search was made for weapons and then he was advised of his rights. Next a thorough search of his person was made. After that the officers searched the vehicle in which he had been seated, finding one hundred dollars beneath the front seat.

 The search of the car falls outside the permissible scope of a search incident to a lawful arrest. Chimel limited the area to the person of the arrestee and the area within his immediate control. Both Colon and Felix-Ortiz were under arrest and outside the car when the search was made. They were not free to reenter the vehicle. In no way was the interior of the car within the immediate control of either man. There was no possibility that either man could reach into the car to destroy evidence or to procure a weapon.

27

Nor did any of the exigent circumstances exist so as to necessitate an immediate search of the vehicle. There was no imminent threat of the removal or destruction of any evidence. Nor were the officers in any danger from anything which might have been hidden in the car. This is precisely the situation where no harm is done to any legitimate law enforcement need by requiring the officers to wait until they have obtained a warrant. Rather than have the arresting officers make a determination of probable cause to believe that money was hidden in the car, the better practice would have been to lawfully impound the vehicle until a neutral, detached magistrate could be presented with all of the facts and circumstances to make the probable cause determination. If the arrested person objects to the imposition of having his car impounded he can always consent to an immediate search in order to eliminate any reason for having the car seized. If the person is in fact hiding evidence of a crime in the vehicle then he has no grounds upon which to complain of having the car held until a warrant can be obtained.

Having based my conclusion that the money seized from the car should be suppressed upon my own intuitive logic and understanding of the policies underlying the Fourth Amendment exclusionary rule, I now feel compelled to examine the relevant case law. At an early date, in Carroll v. United States, 267 U.S. 132 (1925), the Supreme Court recognized a distinction between searches involving automobiles and searches of dwelling places, and the like. It was thought that the inherent mobility of motor vehicles was sufficient justification for applying special search rules. In analyzing the automobile search cases, however, it is crucial to recognize that where the special characteristics of the automobile (i.e. mobility) do not come into play because of the facts of a particular case, there is no reason to apply different standards in

judging the validity of a search of a car than you would for the search of a dwelling place.

The case of Preston v. United States, 376 U.S. 364 (1964) provides direct support for the position taken by me herein. In Preston three men who had been seated in a parked car for several hours were arrested by police for vagrancy and taken to the police station. The car was towed to a garage and soon thereafter the arresting officers went to the garage and searched the car without a warrant. Evidence which was seized was used at a trial which led to Preston's conviction for robbery. The Supreme Court held that the evidence seized from the car was inadmissible, finding no justification for a warrantless search once the men had been arrested and the car was towed to the garage.

Later decisions have cut substantial inroads into the Preston holding, but I do not feel impelled by these cases to alter the result which I have reached. Foremost of these decisions for our consideration is Chambers v. Maroney, 399 U.S. 42 (1970). In Chambers the Supreme Court upheld a warrantless search of a car in which suspected armed robbers were riding even after the car had been taken to the police station. The majority concluded that given probable cause to search there is "no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant." 399 U.S. at 52.

 I respectfully decline to follow Chambers if it permits a police officer to make the probable cause determination himself where there are no exigent circumstances making this course necessary. In my view this creates a constitutional distinction for searching automobiles as opposed to homes without a difference. I reiterate my belief that if the intrusion of having the car seized until

a warrant can be obtained is too great, the person can consent to a search. From Part II of this opinion it should be clear that I am not saying that police officers are never qualified to make a probable cause determination, but where there is time to have this done by a neutral, detached magistrate without any harmful effect to the needs of law enforcement, this is the far better and safer constitutional course.

 I need not decide whether the actions observed by Investigator Escudero as he approached the car, along with all of the other information, gave him probable cause to search the car. There was no need for him to make this determination. Any search of the vehicle should have been delayed until a warrant issued upon probable cause could have been obtained from a judicial officer.

## IV. The Statements

Lastly, I shall turn my attention to the statements given by Colon and De Leon to the Immigration officers late on the night of February 6, 1976 or during the early morning hours of February 7, 1976.

### A.

Tomas Colon-Franco ("Colon") is a 46-year-old Puerto Rican living in St. Croix. He has a sixth grade education and is able to read and write Spanish. Though he is able to speak a little English, he can neither read nor write the English language.

When Colon was arrested in the driveway of the Spencer home he was properly advised of his rights in Spanish by Investigator Escudero. Escudero speaks, reads, and writes both English and Spanish fluently. He has served as an interpretor at Immigration proceedings for several years.

 Colon was later taken to police headquarters where he was properly advised of his rights in Spanish for a second time by Investigator Escudero. Colon indicated that he did not wish to consult with an attorney and he signed a written waiver form which was printed in Spanish. I find that Colon made a knowing and intelligent waiver of his privilege against self-incrimination and of his right to counsel within the meaning of Miranda v. Arizona, 384 U.S. 436 (1966).

Following the signing of the waiver, the interrogation of Colon by Investigator Escudero proceeded. Escudero asked the questions in Spanish, Colon answered in Spanish, and then Escudero would write down the answers in English. When the entire statement was completed Escudero read the statement to Colon in Spanish and then presented it to him for his signature. Colon was "told" to sign the last page and to initial each preceding page, which he did.

 I cannot condone the practice that was followed in this case. I consider it an outrageous act to present a suspect with a statement for his signature which is written in a language that he is unable to read. Is it too much to ask an interrogator who is fluent in two languages to write the statement, questions and answers, in the language of the suspect, and then later to translate it to the language which is needed for his own records? I believe that this is the only practice which will pass constitutional muster.

I do not feel that Escudero's reading the statement back to Colon before having him sign it eliminates the taint. It is difficult to listen to someone else read and to analyze the import of what is being said at the same time. If a suspect is able to read, he or she should have the opportunity to study the statement as it has been transcribed to see whether the spoken words have been altered and to decide

whether he really wishes to sign a statement to whatever effect.

 I will grant Colon's motion to suppress his statement insofar as introducing the signed, written statement into evidence. This will not prevent Investigator Escudero from testifying as to his recollection of what Colon said to him.[2] Since I find that Colon made a knowing and intelligent waiver of his rights and that he voluntarily gave a statement to the Immigration officers, any defects in the transcription and signing of the statement will not necessitate the exclusion of oral testimony about the statement. Investigator Escudero was instructed by the Court that he could not refer to the written statement or refresh his recollection of what was said to him by Colon. He would only be permitted to testify about that which he could remember himself about the interrogation.

### B.

Claytus De Leon is a 42-year-old permanent resident of St. Croix who is originally from Trinidad. He is able to read, write, and speak English. De Leon was advised of his rights when arrested at Spencer's home and readvised of the rights after he was taken to police headquarters.

De Leon was interrogated by Investigator Suitt. When advised of his rights at the police station by Suitt, De Leon indicated that he wished to consult with his attorney. He was given permission to do so and then went to place a call to a local attorney. When De Leon received no answer from the attorney, he returned to the interrogation room. When told that he would be taken down to a cell to be detained overnight, De Leon indicated that he would still

---

[2] Just as if the written statement were being introduced into evidence, Investigator Escudero would have to adjust his testimony regarding what Colon said to him to delete all references to co-defendant De Leon, as dictated by Bruton v. United States, 391 U.S. 123 (1968).

like to speak to an attorney but that he was willing to give a statement.

Miranda v. Arizona, 384 U.S. 436 (1966) is premised on the right to counsel. It was felt that the presence of an attorney at the station house would assure that the suspect's privilege against self-incrimination would not be abused. The opinion states in unequivocal language:

> If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent. 384 U.S. at 474.

I am mindful of the cases holding that an arrestee can change his mind voluntarily after requesting an attorney and decide to give a statement. See, e.g., United States v. Hodge, 487 F.2d 945 (5th Cir. 1973); Collins v. United States, 462 F.2d 792 (2d Cir.), cert. denied, 409 U.S. 988 (1972). I agree that where a suspect unequivocally indicates that he no longer wishes to see an attorney before making a statement, the interrogation may continue. De Leon's statement, in my opinion, does not meet this high standard.

De Leon indicated, after unsuccessfully attempting to reach an attorney and after being told that he would be taken downstairs for the night, that he would still like to see an attorney but that he was willing to make a statement. This statement can be interpreted in two ways —(1) as a waiver of the right to have an attorney present, as the Immigration officers took it to be, or (2) that De Leon would be willing to make a statement only after an attorney was supplied. With such fundamental constitutional rights at stake, I must and shall interpret this statement in the light most favorable to the defendant.

33

 I can only conclude that the Immigration officers should not have resumed their interrogation of De Leon following this indication to them. At the very least they should have waited until he had time to call his attorney after awhile or to explain the procedure whereby he could have contacted another attorney. I cannot find that he made a voluntary, knowing, and intelligent waiver of his right to have an attorney present. Accordingly, I will grant De Leon's motion to have his statement suppressed. Moreover, in view of the invalid waiver there cannot be any oral testimony at trial with respect to the statement.

## ORDER

In accordance with my rulings on these motions as have been stated into the record, and with the Memorandum Opinion of even date herewith to which this Order is attached, and for the reasons set forth therein, It is hereby
ORDERED:

1. That defendant Colon's motion to suppress the marriage certificate seized from his person be and the same is hereby DENIED.

2. That defendant De Leon's motion to suppress the money seized from his person be and the same is hereby DENIED.

3. That defendant Colon's motion to suppress money seized from the car be and the same is hereby GRANTED.

4. That defendant Colon's motion to suppress his statement be and the same is hereby GRANTED insofar as introducing any written statement into evidence.

5. That defendant De Leon's motion to suppress his statement be and the same is hereby GRANTED in its entirety.